UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------- X

IRIS CORPORATION,

                    Plaintiff,
                                        **REPORT AND**
        -against-                       **RECOMMENDATION**

JAPAN AIRLINES INTERNATIONAL CO., LTD.,  06-CV-6336 (CBA)(KAM)

                    Defendant.
-------------------------------------- X

**MATSUMOTO, United States Magistrate Judge:**


        By order dated June 4, 2007, pursuant to 28 U.S.C. §

636(b), United States District Judge Carol B. Amon referred to

the undersigned for a report and recommendation Japan Airlines

International Co., Ltd.'s ("defendant" or "Japan Airlines")

motion to dismiss IRIS Corporation's ("plaintiff" or "IRIS")

amended complaint of December 12, 2006.  Japan Airlines moves

pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing

that IRIS's allegation of direct infringement of U.S. Patent No.

6,111,506, in violation of 35 U.S.C. § 271(g), fails to state a

claim upon which relief can be granted.  (See Dkt. No. 6, Amended

Complaint ("Am. Compl."), dated 12/12/06.)

        For the reasons set forth below, it is respectfully

recommended that defendant's motion to dismiss be granted.

-1-

# I.  BACKGROUND

Plaintiff IRIS filed this action on November 28, 2006,
and amended its complaint on December 18, 2006, alleging that
Japan Airlines directly infringes U.S. Patent No. 6,111,506 ("the
'506 patent") entitled "Method of Making an Improved Security
Identification Document Including Contactless Communication
Insert Unit."  (Am. Compl. ¶ 20.)  IRIS is the assignee of the
'506 patent, which was filed on October 14, 1997, and issued on
August 29, 2000, naming as inventors two Malaysians: Chas Hock
Eng Yap and Foong Mei Chua.  (Am. Compl. ¶ 7, Ex. A.)  The
inventions of the '506 patent generally relate to "an improved
security identification document for use in a wide variety of
identification and security systems and a method of making the
improved security document."  (Am. Compl., Ex. A. cl. 1:10-15.)
The '506 patent includes seven method claims[1] (cl. 20:10-64.),
including one independent method claim (Claim 1, cl. 20:10-34),
and six dependent claims (Claims 2-7, cl. 20:35-64).

Before the court is Japan Airlines's motion to dismiss
IRIS's amended complaint pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure for failure to state a claim upon which

---

[1] The terms "method claims" and "process claims" are
synonymous. See State Street Bank & Trust Co. v. Signature Fin.
Group, Inc., 149 F.3d 1368, 1372 (Fed. Cir. 1998), cert. denied,
525 U.S. 1093 (1999) ("Furthermore, the Supreme Court's decisions
in Diehr, Benson, and Flook, all of which concerned method (i.e.,
process) claims, have provided and supported the principles which
we apply to both machine- and process-type claims.").

relief can be granted.

IRIS's complaint concerns the allegedly infringing use by defendant of secure electronic passports manufactured using a patented process for making a secure computer identification chip. (Am. Compl. ¶ 8.) According to the complaint, in 1997, Messrs. Yap and Chua "developed a method for manufacturing a secure electronic passport, which, among other things, is a document consisting of a computer chip containing biographical and/or biometric data relating to the particular passport holder." (Id. ¶ 8.) The following year, IRIS began providing the Malaysian government with electronic passports embodying the technology patented in the '506 patent. (Id. ¶ 10.)

An era of heightened global security soon followed and the IRIS technology piqued the interest of various governments, including the United States. (Id. ¶ 11, Ex. B.) Indeed, following the launch of Malaysia's secure passport, Special Agent-in-Charge Neville W. Cramer, of the U.S. Immigration and Naturalization Service ("INS"), wrote on January 14, 2000, to Malaysia's Director General of Immigration to congratulate Malaysia as the first "in the world to use sophisticated high-tech 'chip' technology" in passport production. (Id.) Mr. Cramer also announced that INS had commenced "a program with IRIS Technologies to pilot test" Malaysia's verification system "using 'passport' chip readers at selected U.S. ports of entry." (Id.)

The United States government, according to the complaint, thereafter determined that it would begin to use electronic passports, and that, under its Visa Waiver Program, any foreign national who had previously been able to enter the United States for tourism or business purposes without a visa would now be required to use an electronic passport to remain eligible to participate in the program.[2] (Id. ¶ 12.) Japan, a participating country in the U.S. Visa Waiver Program, formed a Government Working Group ("Working Group") to evaluate the introduction of electronic passports. (Id. ¶¶ 13-14.) Japan Airlines allegedly became a member of the Working Group and helped "the Japanese Government implement workable and internationally compatible Japanese electronic passports and electronic passport readers." (Id. ¶ 14.) To that end, Japan Airlines allegedly communicated with IRIS about IRIS's technological methods and procedures pertaining to electronic passports, and conducted a study of IRIS's '506 patent. (Id. ¶ 15.) The Japanese government subsequently began issuing electronic passports at least as early as March 2006. (Id. ¶ 13.)

---

[2] The U.S. Department of State's website uses the terms "machine-readable passport," "integrated chip," and "e-Passport" to describe the electronic passport eligible for the Visa Waiver Program. See U.S. Department of State, Visa Waiver Program, http://travel.state.gov/visa/temp/without/without_1990.html (last visited Dec. 4, 2007).

By October 2006, many other nations had introduced electronic passports, including "the United Kingdom, France, Germany, Australia, Ireland, Italy, New Zealand, Spain, Switzerland, Sweden and Portugal." (<u>Id.</u> ¶ 16.) Subsequently, Japan Airlines began "processing and/or boarding" passengers who were issued electronic passports manufactured, according to the methods disclosed and claimed in the '506 patent, at New York City's John F. Kennedy International Airport ("JFK"), and other American Japan Airlines's check-in facilities, thereby "using" a "product" that embodied a patented process as set forth in 35 U.S.C. § 271(g). (<u>Id.</u> ¶¶ 18-19.)

After a pre-motion conference before the undersigned on March 23, 2007, and according to the scheduling order of that same day, Japan Airlines filed the fully briefed motion to dismiss pursuant to Rule 12(b)(6) on June 1, 2007 (dkt. nos. 24-26), which Judge Amon referred to the undersigned on June 4, 2007. Supplemental submissions were made pursuant to the court's order dated December 6, 2007 (dkt. nos. 27-29, 30-31), and the court heard oral argument on December 20, 2007.

Japan Airlines's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) seeks relief on the grounds that: (1) under Title 35 of the United States Code, the terms "product" and "use" in § 271(g) do not encompass the government-owned electronic passports handled by Japan Airlines because

passports are not "products" and Japan Airlines is nowhere "in the chain of distribution and supply of passports" (Def.'s MOL at 20-25); (2) United States federal laws requiring Japan Airlines to examine passports conflict with the patent laws and must thus be reconciled and harmonized with an exception to infringement (Def.'s MOL at 6-15); (3) foreign laws and regulations that require Japan Airlines to examine passports require application of the "doctrine of foreign sovereign compulsion" and insulate Japan Airlines from liability under the patent laws (Def.'s MOL at 16-19); and (4) at least insofar as IRIS's complaint pertains to United States passports, IRIS's exclusive remedy for infringement is against the United States government in the Court of Federal Claims pursuant to 28 U.S.C. § 1498(a) (Def.'s MOL at 2-6).

## II. DISCUSSION

### A. Motion To Dismiss Standard

Japan Airlines moves to dismiss in its entirety IRIS's amended complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. Under the pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure, complaints must include "a short and plain statement of the claim showing that the pleader

is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[A] plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests." Leibowitz v. Cornell Univ., 445 F.3d 586, 591 (2d Cir. 2006). Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005).

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."[3] McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a

---

[3] To the extent the parties have submitted materials beyond the complaint, the court has only considered statutes, regulations, legislative history, treaties, and dictionaries. See Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991) ("In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."); Kopec v. Coughlin, 922 F.2d 152, 154 (2d Cir. 1991) ("Rule 12(b) gives district courts two options when matters outside the pleadings are presented in response to a 12(b)(6) motion: the court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.") (citations omitted).

plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. ---, 127 S.Ct. 1955, 1964 (2007) (citations, quotations and footnotes omitted).


**B.  Direct Infringement of the '506 Patent under 35 U.S.C. § 271(g)**

On August 23, 1988, Congress passed the Omnibus Trade and Competitiveness Act of 1988 (the "Act"), Public Law No. 100-418, adding subsection (g) to Section 271 of the patent statute. Bristol-Myers Co. v. Erbamont Inc., 723 F. Supp. 1038, 1041 (D. Del. 1989).  "Prior to the enactment of § 271(g), a process patent holder had a remedy under the patent laws only if the unauthorized use of the [] patented process occurred within the United States." Pfizer Inc. v. Aceto Corp., 853 F. Supp. 104, 105 (S.D.N.Y. 1994).  As a result, "[a] process patent holder had no remedy against a foreign company that manufactured goods using the patented process and subsequently imported the goods into the United States.  Section 271(g) was enacted to provide such a remedy, in recognition of the fact that '[t]here

is no logical reason to exclude from the ambit of patent

infringement acts associated with the abuse of a United States

process <u>as long as they occur within the reach of United States</u>

<u>domestic law.</u>'"  <u>Id.</u> (quoting H.R. Rep. No. 60, 100th  Cong., 1st

Sess. 6 (1987)) (emphasis in original).  This new subsection, 35

U.S.C. § 271(g), provides that:

> Whoever without authority imports into the
> United States or offers to sell, sells, or
> uses within the United States a product which
> is made by a process patented in the United
> States shall be liable as an infringer, if
> the importation, offer to sell, sale, or use
> of the product occurs during the term of such
> process patent. In an action for infringement
> of a process patent, no remedy may be granted
> for infringement on account of the
> noncommercial use or retail sale of a product
> unless there is no adequate remedy under this
> title for infringement on account of the
> importation or other use, offer to sell, or
> sale of that product. A product which is made
> by a patented process will, for purposes of
> this title, not be considered to be so made
> after--
>
> (1) it is materially changed by subsequent
> processes; or
>
> (2) it becomes a trivial and nonessential
> component of another product.

35 U.S.C. § 271(g).

IRIS's amended complaint alleges that Japan Airlines's

inspection of electronic passports at JFK and other Japan

Airlines facilities in the United States violates Section 271(g)

because, by doing so, Japan Airlines, "without authority," "uses

within the United States," passports ("a product"), which are

"made by a process patented in the United States," namely the '506 patent. Thus, IRIS asserts that Japan Airlines is "liable as an infringer" pursuant to 35 U.S.C. § 271(g).

Japan Airlines responds, <u>inter alia</u>, that IRIS fails to state a claim under § 271(g) because: (1) passports are not "products" as contemplated by § 271(g); and (2) Japan Airlines's examination of passports is not a "use" within the meaning of § 271(g). (Def.'s MOL at 20-25.) The court considers each of these arguments below.

### 1. **"Product" under 35 U.S.C. § 271(g)**

First, with respect to whether a passport is a "product" within the meaning of § 271(g), Japan Airlines contends that, in enacting § 271(g), Congress intended for the term "product" to encompass only "goods" imported into the United States's commercial marketplace, and that because the accused passports remain the property of the issuing country's government, they do not enter the stream of commerce nor are they "imported" into the United States. (Def.'s MOL at 20-22.) IRIS, on the other hand, posits that the term "product" includes "any tangible, physical good that has been manufactured, irrespective of whether or not it is distributed commercially, marketed, sold, or otherwise injected into the stream of commerce." (Pl.'s Opp'n at 21.)

The United States Supreme Court has directed that
"[t]he starting point in statutory interpretation is 'the
language [of the statute] itself.'" <u>United States v. James</u>, 478
U.S. 597, 604 (1986), <u>abrogated on other grounds by</u> <u>Central Green
Co. v. United States</u>, 531 U.S. 425 (2001) (quoting <u>Blue Chip
Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 756, (1975) (Powell,
J., concurring)).  Absent the presence of special circumstances,
when the terms of a statute are unambiguous, judicial inquiry is
complete.  <u>See</u> <u>Burlington N. R.R. Co. v. Oklahoma Tax Comm'n</u>, 481
U.S. 454, 461 (1987); <u>Garcia v. United States</u>, 469 U.S. 70, 75
(1984) ("Notwithstanding petitioners' argument to the contrary,
we are satisfied that the statutory language with which we deal
has a plain and unambiguous meaning.  While we now turn to the
legislative history as an additional tool of analysis, we do so
with the recognition that only the most extraordinary showing of
contrary intentions from those data would justify a limitation on
the 'plain meaning' of the statutory language.  When we find the
terms of a statute unambiguous, judicial inquiry is complete,
except in rare and exceptional circumstances.") (citations and
quotations omitted).

To resolve the current dispute, it is necessary for the
court to determine the meaning of the term "product" as referred
to in § 271(g).  As "[d]ictionaries of the English language
provide the ordinary meaning of words used in statutes," <u>Bayer AG</u>

v. Housey Pharms., Inc., 340 F.3d 1367, 1371-72 (Fed. Cir. 2003),

Japan Airlines relies on Black's Law Dictionary, which defines

"product" as "Something that is distributed commercially for use

or consumption and that is usu[ally] (1) tangible personal

property, (2) the result of fabrication or processing, and (3) an

item that has passed through a chain of commercial distribution

before ultimate use or consumption." Black's Law Dictionary (8th

ed. 2004); see also The Oxford English Dictionary, 2d Vol. XII

(1989)("That which is produced by an action, operation, or work;

a production; the result. Now freq[uently] that which is

produced commercially for sale."). Japan Airlines relies on these

definitions, of course, because passports, at least insofar as

their end users are concerned, are not customarily produced or

distributed commercially for sale.[4]

In opposition to Japan Airlines's arguments, IRIS notes

that the Random House Webster's Unabridged Dictionary (2d ed.

2001) — a source relied upon by the Federal Circuit in Bayer AG,

340 F.3d at 1371-72 — states that a "product" is simply a "thing

produced by labor," or alternatively, a "thing produced by or

resulting from a process." Similarly, according to Webster's New

_____

[4] The court notes that passports are not entirely outside
the bounds of commerce. Passports also play a crucial role in
the ability of commercial airline carriers and other
transportation providers to transport individual passengers
between countries. Thus, this court cannot conclude that
passports do not play any role in the stream of commerce.

Int'l Dictionary (Unabridged) (3rd ed. 1969), a "product" is
"something produced by physical labor or intellectual effort."
These broader definitions comport with the etymology of the word
"product," which is derived from the 15th century Latin word
productum, meaning "something produced."  Merriam-Webster's
Online Dictionary, http://www.webster.com/dictionary/product
(last visited Dec. 4, 2007); cf. Zicherman v. Korean Air Lines
Co., 516 U.S. 217, 222 (1996) (rejecting the natural and ordinary
meaning of "damage" when it would produce over-broad and
nonsensical results); Jarecki v. G.D. Searle & Co., 367 U.S. 303,
307-09 (1961) (adopting a more technical interpretation of the
word "discovery" because of its over-broad ordinary meaning).
Thus, under this ordinary, albeit more expansive, definition of
"product," passports, which are the tangible result of a
manufacturing process involving labor, are "products."

    This broader definition appears consistent with the way
in which the Federal Circuit has interpreted the term "product,"
at least insofar as the court finds no precedent in which the
Federal Circuit has included a commercial component in the term
"product," as used in Section 271(g).  For instance, in Bayer AG,
the Federal Circuit acknowledged that the term "product" in §
271(g) is ambiguous, in considering whether research data that
derived from the performance of a method to identify a substance
was "a product which is made by a process."  Id. at 1370.  The

court held that "in order for a product to have been 'made by a process patented in the United States' it must have been a physical article that was 'manufactured.'" <u>Id.</u> at 1377.

Similarly, in <u>NTP, Inc. v. Research in Motion, LTD.</u>, 418 F.3d 1282 (Fed. Cir. 2005), <u>cert. denied</u>, 546 U.S. 1157 (2006), the Federal Circuit held that plaintiff had no cause of action under § 271(g) because "the transmission of information" "does not entail the manufacturing of a physical product." <u>Id.</u> at 1323. Thus, the term "product," as interpreted by the Federal Circuit in <u>Bayer AG</u> and <u>Research in Motion</u>, and commensurate with general dictionary definitions, refers to a physical article that was manufactured, such as passports.

In further support of its contention that the term "product" contains an additional commercial limitation, Japan Airlines urges the court to examine the legislative intent of the statute, as the Federal Circuit did in <u>Bayer AG</u>. 340 F.3d at 1371-75**.** The Supreme Court has stated that "[i]n the absence of a 'clearly expressed legislative intention to the contrary,' the language of the statute itself 'must ordinarily be regarded as conclusive.'" <u>James</u>, 478 U.S. at 606 (quoting <u>Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.</u>, 447 U.S. 102, 108 (1980)). Japan Airlines points to portions of the legislative history of Section 271(g) in support of its argument that the term "product" as used in Section 271(g) includes only those "products" that

-14-

have entered the stream of commerce.  (Def.'s MOL at 20-21.)
That legislative history, however, reveals the Congressional
recognition that Section 271(g) was intended to provide a remedy
by making unlawful the importation of a product made through use
of an American process patent.  <u>See generally</u> H.R. Rep. No. 60,
100th Cong., 1st Sess. 6 (1987).

Had Congress intended the term "product" to have a
narrower, specialized meaning such that physical items that never
enter the stream of commerce in the United States are not the
subject of infringement liability, it could have done so by
placing the adjective "commercial" in the text of § 271(g), as it
has in other subsections.  <u>See, e.g.</u>, 15 U.S.C. § 271(a)(1)-(3)
("Improvements in manufacturing and product technology depend on
fundamental scientific and engineering research to develop . . .
(B) new technological processes by which such improved methods
may be used in practice to improve manufacturing and to assist
industry to transfer important laboratory discoveries into
<u>commercial products</u>.") (emphasis added); 15 U.S.C. § 521 ("The
term 'aquatic products' includes all <u>commercial products</u> of
aquatic life in both fresh and salt water.") (emphasis added); 7
U.S.C. § 2702 ("The term 'products of spent fowl' means
<u>commercial products</u> produced from spent fowl.") (emphasis added).
For this court to read a commercial requirement into the term
"product" as used in Section 271(g) would render redundant

Congress's use of the adjective "commercial" to modify the term "product" in the preceding citations.

Indeed, the fact that Congress included the following sentence within Section 271(g) demonstrates that Congress contemplated when commerciality should be considered in subsection 271(g): "In an action for infringement of a process patent, no remedy may be granted for infringement on account of the noncommercial use or retail sale of a product unless there is no adequate remedy under this title for infringement on account of the importation or other use, offer to sell, or sale of that product."[5]  35 U.S.C. § 271(g) (emphasis added).  Clearly, Congress could have further limited Section 271(g)'s scope to only commercial products by inserting the modifying word "commercial" before the word "product" rather than relying on the foregoing, conditional, noncommercial exclusion.  "To argue otherwise is to tag Congress with an extravagant preference for the opaque when the use of a clear adjective or noun would have worked nicely."  Gutierrez v. Ada, 528 U.S. 250, 256 (2000).

Similarly, Congress could have provided an explicit and narrow definition of the term "product," as used in § 271(g), as

---

[5] On December 6, 2007, the court ordered additional briefing addressing the effect, if any, of this provision on the parties' respective positions regarding Japan Airline's instant motion to dismiss.  The court agrees with the parties' submissions that the language has no effect on the issues presented by defendant's motion.  (See generally Dkt. Nos. 27-31.)

it has done in other contexts within the patent statute.  Title
35 U.S.C. § 156(f), for example, defines the term "product" for
the purposes of that section as "A drug product" or "Any medical
device, food additive, or color additive subject to regulation
under the Federal Food, Drug, and Cosmetic Act."  See Glaxo
Operations UK Ltd. v. Quigg, 894 F.2d 392, 399 (Fed. Cir. 1990)
(noting that Congress's "explicit and precise" definition of
"product" in § 156(f)(2) indicated that "Congress specifically
selected terms with narrow meanings that it chose from among many
alternatives").

Finally, with respect to Japan Airlines's argument that
passports cannot be "products" because their true owners are
their issuing governments, the court is unaware of any legal
authority for the proposition that ownership determines whether
an item is a "product."  Nor does the statute provide that
ownership of a product should determine whether a user of that
product is liable as an infringer under 35 U.S.C. § 271(g).  Cf.
Trs. of Columbia Univ. v. Roche Diagnostics GMBH, 272 F. Supp. 2d
90, 108 (D. Mass. 2002) ("[I]t is irrelevant under Section 271(g)
who manufactured the goods so long as the goods were manufactured
using a patented process.  Instead, under the statute, liability
attaches to one who, without authority, imports a product made by
a patented process into the United States.  The defendant need
not have performed the patented process itself.") (emphasis in

original).  The court notes that "ownership" is explicitly addressed in other sections of the patent laws.  <u>See, e.g.</u>, 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent."); <u>Ortho Pharm. Corp. v. Genetics Inst., Inc.</u>, 52 F.3d 1026, 1032-33 (Fed. Cir. 1995), <u>cert. denied</u>, 516 U.S. 907 (1995); <u>Beech Aircraft Corp. v. EDO Corp.</u>, 990 F.2d 1237, 1248 (Fed. Cir. 1993); Manual of Patent Examination and Procedure § 301 (8th ed. 2007) ("Ownership of a patent gives the patent owner the right to exclude others from making, using, offering for sale, selling, or importing into the United States the invention claimed in the patent." (citing 35 U.S.C. § 154(a)(1))).

Thus, IRIS's complaint has sufficiently alleged that passports are products within the meaning of 35 U.S.C. § 271(g). Accordingly, Japan Airlines's motion to dismiss should be denied on this ground.


### 2.   **"Use" under 35 U.S.C. § 271(g)**

Further, Japan Airlines argues that it is not subject to patent infringement liability under § 271(g) because "examination" of a passport is not a "use" as contemplated by the statute.  This argument also fails because it ignores the ordinary meaning of the term "use."

Nearly a century ago, the Supreme Court touched on the

issue of use in the context of the patent laws in <u>Bauer & Cie v.</u>

<u>O'Donnell</u>, 229 U.S. 1 (1913). According to Justice Day:

> In framing the act and defining the extent of
> the rights and privileges secured to a
> patentee, Congress did not use technical or
> occult phrases, but in simple terms gave an
> inventor the exclusive right to . . . use . .
> . his invention for a definite term of years.
> . . . The right to use is a comprehensive
> term and embraces within its meaning the
> right to put into service any given
> invention. . . . An inventor has not only
> the exclusive right to make and vend his
> invention or discovery, but he has the like
> right to use it; and when a case comes fairly
> within the grant of the right to use, that
> use should be protected by all means properly
> within the scope of the statute.

<u>Id.</u> at 10-11, 14.

The Federal Circuit also interprets the term "use"

broadly. In <u>Research in Motion</u>, the Federal Circuit noted, for

example, that: "The ordinary meaning of 'use' is to 'put into

action or service.' <u>Webster's Third New Int'l Dictionary</u> 2523

(1993). The few court decisions that address the meaning of

'use' have consistently followed the Supreme Court's lead in

giving the term a broad interpretation." 418 F.3d at 1317

(citing <u>Roche Prods., Inc. v. Bolar Pharm. Co.</u>, 733 F.2d 858, 863

(Fed. Cir. 1984), <u>superseded in part by</u> 35 U.S.C. § 271(e)

(holding that testing is a "use")).

Although courts evaluating patent claims generally

interpret the word "use" broadly, district courts have concluded

that the term does not include activities tangentially involving

the accused product.  See, e.g., L.A. Gear, Inc. v. E.S.
Originals, Inc., 859 F. Supp. 1294 (C.D. Cal. 1994).  For
example, merely observing an allegedly infringing product,
demonstrating a device, or observing a demonstration of a device,
does not constitute a "use" of that product.  Id.  Similarly, at
least one court has held that the mere displaying of a patented
item for advertising may not technically constitute a "use."
Quantum Corp. v. Sony Corp., 16 USPQ2d. 1447, 1450 (N.D. Cal.
1990); cf. Olsson v. United States, 25 F. Supp. 495, 498 (Ct. Cl.
1938), cert. denied, 307 U.S. 621 (1939) (possession and
maintenance of disassembled guns was infringing use although they
were merely "available for their normal and intended use for
national defense"); Donnely Corp. v. Reitter & Schefenacker GmbH
& Co., 189 F. Supp. 2d 696, 704-05 (W.D. Mich. 2002) (the display
of an infringing product in a sales meeting where the purpose was
to generate interest in the infringing product constituted
infringing use).

        Based on the foregoing, while it is clear that the term
"use" does not touch on all conceivable activity that could occur
with a passport, the court can think of no more apt "use" than
that for which a passport is designed: to facilitate the
identification of its bearer.  Indeed, in support of its foreign
sovereign compulsion defense, addressed infra, Japan Airlines
itself asserts that passports are "used" by the United States to

identify their bearer, to provide evidence that the sovereign has authorized its citizens to travel to a foreign country and return to their home country, and to request that other foreign sovereigns allow the bearer to enter and pass freely and safely. (Def.'s MOL at 4.) IRIS's complaint thus adequately alleges that the inspection of passports by Japan Airlines in its boarding process constitutes a "use" within the meaning of 35 U.S.C. § 271(g). Accordingly, Japan Airlines's argument that examination of passports does not constitute a "use" under § 271(g) is without merit.

## C. <u>Conflicts of Laws, Regulations, and Treaty</u>

Japan Airlines's motion to dismiss IRIS's complaint is further predicated on the argument that the court must reconcile a conflict between the alleged § 271(g) infringement of the '506 patent and various federal statutes, regulations and one international treaty. Japan Airlines contends that because the Enhanced Border Security and Visa Entry Reform Act of 2002 ("Enhanced Border Security Act"), 8 U.S.C. §§ 1221, <u>et</u> <u>seq.</u>, federal regulations, 19 C.F.R. § 122.75a, and the Convention on International Civil Aviation, Dec. 7, 1944, 61 Stat. 1180, 15 U.N.T.S. 295 ("the Chicago Convention"), require airlines to provide United States border officials with passenger, crew and occupant information, including but not limited to passport

number and country of issuance, before flights depart from or enter the United States, based upon the airlines's inspection of the passports of passengers and crew members, a conflict exists between the Enhanced Border Security Act, 8 U.S.C. § 1221, et seq., federal regulations, and the Chicago Convention, and patent infringement liability under 35 U.S.C. § 271(g). (Def.'s MOL at § II.) Japan Airlines thus urges the court to reconcile this conflict by determining that the interests propounded under the passport inspection and reporting requirements — national security — outweigh the underlying interest of § 271(g) of the patent statute – "to protect United States process patentholders against the infringements of foreign manufacturers who avoid liability by applying the process in other countries and selling [or using] the subject goods in the United States." Allegheny Ludlum Corp. v. Nippon Steel Corp., 765 F. Supp. 224, 226 (E.D. Pa. 1991).

Notably, IRIS does not dispute for the purposes of this motion that Japan Airlines must comply with federal and international legal and regulatory obligations to inspect the identification documents of passengers, crew members and other occupants. Nor does IRIS dispute that Japan Airlines must "use" the passports of its passengers and crew to obtain and report necessary information, including the passport number and issuing country. Rather, IRIS contends that Japan Airlines has failed to

demonstrate that it nevertheless is exempted from patent
infringement liability.  (Pl.'s Opp'n at 11.)

As discussed above, pursuant to 35 U.S.C. § 271(g),
passports are "products," and Japan Airlines's handling of those
passports during the fulfillment of its mandated inspection is a
"use" that invokes potential infringement liability under §
271(g).  The court is thus clearly faced with a conflict of laws
that requires reconciliation.

Japan Airlines relies substantially on a single Second
Circuit case — SmithKline Beecham Consumer Healthcare, L.P. v.
Watson Pharms., Inc., 211 F.3d 21 (2d Cir. 2000), cert. denied,
531 U.S. 872 (2000) — for instruction[6] on how this court should
resolve the conflict between the Enhanced Border Security Act and
§ 271(g).  In SmithKline, the Second Circuit was "faced with a
conflict between two statutes," the Hatch-Waxman Amendments,
which "require generic drug producers to use labeling that will
infringe upon copyrights in labels of pioneer drugs," and the
Copyright Act, which "seems to prohibit such copying."  Id. at
23, 27-28 (citing 21 C.F.R. § 314.127(a)(7) ("FDA will refuse to

_____

[6] Although the holding in SmithKline is not controlling in
this case, see 28 U.S.C. § 1295 (proving that the Federal Circuit
possesses appellate jurisdiction in cases where, as here, the
district court's jurisdiction is based on 28 U.S.C. § 1338(a)),
the court believes that the facts are sufficiently analogous to
the instant case to inform the court's determination herein.

-23-

approve [a generic drug[7] application unless] the labeling proposed for the drug is the same as the labeling approved for the [previously approved] listed drug")).  The court reasoned that "if SmithKline's copyright claim has merit, then [the defendant] cannot realistically use the [generic drug application] process . . . because it will have to change the label and lose FDA approval or be enjoined from using a label that infringes SmithKline's copyright."  Id. at 27.

Faced with this conflict, the SmithKline court looked to the primary purpose of each statute and reconciled the two by holding that the Copyright Act should give way to the Hatch-Waxman Amendments because a remedy for copyright infringement in that context "would severely undermine the Hatch-Waxman Amendments," whereas the same could not be said for the reverse scenario.  Id. at 29.

Here, it is undisputed that Japan Airlines is required by federal law to examine the passports of departing passengers at JFK Airport and other American airports during its boarding process and transmit that information to the United States government pursuant, inter alia, to 8 U.S.C. § 1221.  In fact, § 1221(b)-(c) specifically states that:

---

[7] "Generic drugs are identical to pioneer drugs that have previously obtained FDA approval; they can be marketed once the pioneer drug's patent protection and FFDCA [Federal Food, Drug, and Cosmetic Act] exclusivity periods expire."  SmithKline, 211 F.3d at 26.

> For each commercial vessel or aircraft taking
> passengers on board at any seaport or airport
> of the United States, who are destined to any
> place outside the United States, it shall be
> the duty of [the master or commanding
> officer, or authorized agent, owner, or
> consignee, of the commercial vessel or
> aircraft concerned] to provide any United
> States border officer . . . before departure
> from such port manifest information about
> each passenger, crew member, and other
> occupant to be transported . . . . The
> information to be provided with respect to
> each person listed on the manifest . . .
> shall include– (1) complete name; (2) date of
> birth; (3) citizenship; (4) sex; (5) passport
> number and country of issuance; (6) country
> of residence; (7) United States visa number,
> date, and place of issuance . . . .

8 U.S.C. § 1221(b)-(c).

The requirement to provide a passenger manifest is not optional. Rather, the commercial carrier is not "granted clearance papers until the appropriate official . . . has complied with the requirements." 8 U.S.C. § 1221(f). Refusal or failure to provide the manifest information, or furnishing inaccurate information, is subject to fines of $1,000 per person with respect to each instance of inaccurate or incomplete information. 8 U.S.C. § 1221(g).

Assuming, arguendo, that IRIS's patent infringement claim has merit, Japan Airlines, like the defendant in SmithKline, cannot operate its commercial airline within the United States and comply with the Enhanced Border Security Act, without infringing IRIS's '506 patent under 35 U.S.C. § 271(g).

-25-

This court therefore reconciles the two statutes by "adopt[ing] the interpretation that preserves the principles of each." SmithKline, 211 F.3d at 27-28 (citing Zenith Elecs. Corp. v. Exzec, Inc., 182 F.3d 1340, 1347 (Fed. Cir. 1999) ("Unless Congress clearly indicates which of two statutes is to prevail in event of conflict, our responsibility is to interpret and apply them in a way that preserves the purpose of both and fosters harmony between them.") (internal quotations and citations omitted)).

Here, the competing policy interests are national security, on the one hand, and the protection of United States process patent holders from the importation, use, sale or offer to sell, in the United States, products manufactured abroad using processes protected by United States granted patent rights. The interest in our nation's security outweighs IRIS's general commercial interests in its patent under 35 U.S.C. § 271(g). See Franklin v. Massachusetts, 505 U.S. 788, 818 (1992) (recognizing "the principle of judicial deference that pervades the area of national security").

Although the facts presented in the instant case are not entirely analogous to SmithKline, the court recommends the same result. For example, a significant factor underlying the Second Circuit's opinion in SmithKline, which is less prominent here, was that the statutory purpose of the copyright law — "to

encourage the production of creative works by according authors a property right in their works" — was not eviscerated by the excused infringement because the copyright holder gained financially from the sale of the corresponding pioneer drug, and thus mandatory infringement of the copyrighted label did not stifle creativity because there was still an incentive to reap profits from new drugs and thus a congruent need to create new labels. See SmithKline, 211 F.3d at 29; see also Timely Prods. Corp. v. Arron, 523 F.2d 288, 297-98 (2d Cir. 1975) (noting that a patent's only value is "the right to exclude others from the use of the invention during the patent term").

The court notes that if infringement is permitted without recourse for compensatory damages, the incentive to create is understandably diminished, and, consequently, the broad purpose of the patent laws — "to promote the progress of science" — is hindered. U.S. Const. § 8, Art. I; see Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 150-51 (1989) ("The federal patent system thus embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years."). IRIS's amended complaint, however, does not allege that plaintiff was not compensated for manufacturing or licensing the '506 patent in connection with the manufacturing of

electronic passports at the request of the United States and other nations, including Malaysia, Japan, the United Kingdom, France, Germany, Australia, Ireland, Italy, New Zealand, Spain, Switzerland, Sweden and Portugal.  (See Am. Compl. ¶¶ 10-13, 16, 19.)  In this context, the national security interests embodied in the mandate of Enhanced Border Security Act, 8 U.S.C. §§ 1221, et seq., override the patent holder's remedies embodied in 35 U.S.C. § 271(g), the principle purpose of which is to protect process patent holders from economic loss resulting from the practice of the patented process abroad, where the products of that patented process later enter the United States.  See generally H.R. Rep. No. 60, 100th  Cong., 1st Sess. 6 (1987).

Furthermore, as the Second Circuit noted in SmithKline, "[i]n addition to looking to conflicting statutes' principle purposes, courts have traditionally given weight to statutes' priority of enactment and specificity in reconciling conflicts." 211 F.3d at 28 n.3 (citing FDA v. Brown & Williamson Tobacco Corp, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.  This is particularly so where the subsequent statutes more specifically address the topic at hand. . . . [A] specific policy embodied in a later federal statute should

control our construction of the earlier statute, even though it has not been expressly amended")(internal citations and quotation marks omitted)).  Here, Congress enacted the Enhanced Border Security Act in 2002, shortly after the terrorist attacks on our country in September of 2001.  On the other hand, Congress added § 271(g) to Title 35 of the United States Code in 1988, fourteen years earlier.  The relative temporal nature of these two statutes also favors the interpretation that Japan Airlines should not be held liable for patent infringement of the '506 patent for complying with the later enacted Enhanced Border Security Act.

The court would not reach this same conclusion if it were considering defendant's motion only under the U.S. Visa Waiver Program, rather than the Enhanced Border Security Act.  See, e.g., 8 U.S.C. §§ 1187, 1732 (requiring countries to convert to electronic passports to maintain for its citizens the privilege of entering the United States without applying for a visa from abroad).  Japan Airlines has not demonstrated that the Visa Waiver Program requires Japan Airlines to use <u>exclusively</u> electronic passports embodying the technology of the '506 patent.  <u>See</u> <u>FMC Corp. v. Control Solutions, Inc.</u>, 369 F. Supp. 2d 539, 568 (E.D. Pa. 2005) (distinguishing <u>SmithKline</u> on the grounds that "the plain wording of the EPA labeling statutes and regulations [at issue in <u>FMC Corp.</u>] do not mandate copying, but

rather suggest generic companies draft their own language."). Japan Airlines does not assert, for example, that citizens of those participating countries must carry electronic passports to enter the United States. Instead, international travelers need only possess an electronic passport to take advantage of the less-burdensome entry requirements of the Visa Waiver Program. See 8 U.S.C. § 1732(c)(2) ("On and after October 26, 2005, any alien applying for admission under the visa waiver program under section 1187 of this title shall present a passport that meets the requirements of paragraph (1) unless the alien's passport was issued prior to that date.")  Therefore, the U.S. Visa Waiver program does not provide a sufficient basis to dismiss the amended complaint.

Based on the conflict between the Enhanced Border Security Act and 35 U.S.C. § 271(g), the court respectfully recommends that IRIS's amended complaint be dismissed for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).[8]

## D.    **Doctrine of Foreign Sovereign Compulsion**

Japan Airlines further seeks to dismiss IRIS's patent infringement allegations by invoking the defense of "foreign

---

[8] The court does not proceed to determine whether the cited federal regulations, or the Chicago Convention, dictate the same result.

sovereign compulsion." (Def.'s MOL at 16-19.)  Defendant argues

that this judicially-created doctrine exempts Japan Airlines from

liability under the patent laws because Japan Airlines is

compelled by foreign governments, namely Japan and Brazil,[9] to

inspect passports in the United States in the passenger-boarding

process and that "it is unfair to impose liability on a private

party that is compelled to act by a foreign sovereign under

threat of penalties." (Def.'s MOL at 16.)  Japan Airlines

further states that "notions of sovereignty, comity and foreign

relations" shield it from liability for patent infringement.

(Id.)

Although IRIS concedes for the purposes of this motion

that foreign laws and/or regulations require Japan Airlines to

examine passports in the course of its commercial operations,

IRIS argues that the doctrine of foreign sovereign compulsion

does not apply to circumstances involving patent infringement.

Indeed, if this court were to apply the doctrine of foreign

sovereign compulsion to the facts of this case, it would be the

_____

[9] As a practical matter, under an air travel agreement
between the United States and Japan, all of Japan Airlines's
flights that depart from the United States travel either to Japan
or Brazil, and Japan Airlines, pursuant to Japanese and Brazilian
laws and regulations, inspects on American soil the passports of
passengers bound for those destinations.  See Chpt. 6, Art. 56-2,
Japanese Immigration Control and Refugee Act (Gov't Order No.
319, Oct. 4, 1951) (certified translation provided at Def.'s MOL,
App. Tab 4); Brazilian Public Law No. 6.815 (Aug. 19, 1980)
(certified translation provided at Def.'s MOL, App. Tab 5);
(Def.'s MOL at 16-19.)

first instance of which this court is aware that the foreign sovereign compulsion defense was applied beyond the realms of antitrust and discovery violations, to an action for patent infringement.  The court thus proceeds with deliberate caution in analyzing whether the defense should apply here.

After considering the cases upon which Japan Airlines relies, including McElderry v. Cathay Pac. Airways, Ltd., 678 F. Supp. 1071 (S.D.N.Y. 1988) and Interamerican Ref. Co. v. Texaco Marabaibo, Inc., 307 F. Supp. 1291 (D. Del. 1970), the court declines to decide whether those cases provide sufficient grounds to justify extending the foreign sovereign compulsion doctrine to the facts presented in this case.  Given that the court has already determined that the action should be dismissed because federal law mandates Japan Airlines's use of the patented product, the court need not proceed with the foreign sovereign compulsion doctrine analysis, and need not decide whether to extend the doctrine to patent infringement cases.  See SmithKline, 211 F.3d at 25 ("[W]e see little need for further examination of [the fair use or implied license defenses].  If either were to prevail, some new law, essentially judge-made, would have to be fashioned.  In our view, the case can more easily be disposed of on the straightforward ground that the Hatch-Waxman Amendments to the FFDCA not only permit but require producers of generic drugs to use the same labeling as was

-32-

approved for, and is used in, the sale of the pioneer drug, even if that label has been copyrighted. . . . SmithKline's copyright claim is therefore meritless, and we need not address either the fair use or implied license defenses."). Thus the court declines to examine Japan Airlines's arguments for dismissal on the ground of foreign sovereign compulsion.

**E.  28 U.S.C. § 1498(a) Remedy for U.S. Passports**

Finally, Japan Airlines contends that IRIS's exclusive remedy for the alleged infringement of electronic passports issued by the United States government is against the United States government.  (Def.'s MOL at 2-6.)  According to Japan Airlines's reasoning, when, as here, "an invention covered by a U.S. patent is used or manufactured by or for the United States, the sole and exclusive remedy for the patent owner is against the United States government" in the Court of Federal Claims pursuant to 28 U.S.C. § 1498(a).  (Id. at 2-3.)

Although the federal government is protected from any legal action by sovereign immunity, see United States v. Sherwood, 312 U.S. 584, 586 (1941) ("[t]he United States, as sovereign, is immune from suit save as it consents to be sued"), sovereign immunity protection can be waived and conditioned by Congress.  See United States v. Nordic Village Inc., 503 U.S. 30, 34 (1992) (stating that the government's consent to be sued must

be strictly construed in favor of the sovereign and not enlarged
beyond what the language requires).  One such waiver exists in
patent infringement cases.

A patentee's legal recourse against the federal
government for patent infringement is set forth and limited by
the terms of 28 U.S.C. § 1498.  Section 1498(a) provides, in
pertinent part, that:

> Whenever an invention described in and
> covered by a patent of the United States is
> used or manufactured by or for the United
> States without license of the owner thereof
> or lawful right to use or manufacture the
> same, the owner's remedy shall be by action
> against the United States in the United
> States Court of Federal Claims for the
> recovery of his reasonable and entire
> compensation for such use and manufacture.

Id. (emphasis added).

Plaintiff disputes that § 1498(a) provides Japan
Airlines with an affirmative defense because it does not apply to
§ 271(g) claims, but only to § 271(a) claims.  As the court has
already recommended that Japan Airlines's motion to dismiss
pursuant to Rule 12(b)(6) be granted, see supra § C, the court
need not decide whether 28 U.S.C. § 1498(a) provides the
exclusive remedy for plaintiff's infringement claims vis-a-vis
United States passports.

### III. CONCLUSION

For the foregoing reasons, the court respectfully recommends that defendant's motion to dismiss IRIS's amended complaint be granted. Any objections to this Report and Recommendation must be filed with United States District Judge Carol B. Amon within ten days of the date of its entry. Failure to object within ten days of the date of entry will preclude appellate review by the District Court. See 28 U.S.C. § 636(b)(1); Local Civil Rule 6.3; Thomas v. Arn, 474 U.S. 140 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989). Any requests for extensions of time to file objections should be made to Judge Amon.

**SO ORDERED.**
Dated: January 14, 2008
        Brooklyn, New York

_____/s/_____
**Kiyo A. Matsumoto**
United States Magistrate Judge
Eastern District of New York